Filed 12/18/13  In re C.P. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.P., A Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.P.,<br><br>    Defendant and Appellant. | B245097<br>(Los Angeles County<br>Super. Ct. No. YJ36750) |

APPEAL from orders of the Superior Court of Los Angeles County, Charles R. Scarlett, Judge.  Affirmed.

Mary Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

The juvenile court sustained a petition alleging that appellant C.P. engaged in robbery, attempted robbery, and assault and battery. He contends there is insufficient evidence to support these determinations. We reject his contention and affirm.

## RELEVANT PROCEDURAL BACKGROUND

On July 5, 2012, a petition was filed under Welfare and Institutions Code section 602, charging appellant, a minor born in 1996, with second degree robbery (count 1; Pen. Code, § 211), attempted second degree robbery (count 2; Pen. Code, §§ 221, 664), and assault and battery (count 3; Pen. Code, § 242). Following a contested adjudication hearing, the juvenile court sustained the petition, and declared him to be a ward of the court. After determining the robbery-related charges to be felonies and the remaining charge to be a misdemeanor, the court ordered appellant placed in a community camp, and set his maximum term of confinement at five years and ten months. This appeal followed.

## FACTUAL BACKGROUND

A. *Prosecution Evidence*

On July 2, 2012, at approximately 11:45 a.m., Jorge Villa and Melissa Romero were walking on Nectarine Street in Inglewood. As they approached Ash Avenue, Villa heard appellant behind him and turned around. Appellant grabbed Villa's neck, pointed a gun at him, and said, "Give me what you have."[1] When appellant reached into Villa's right pocket, Villa tried to push appellant away. In response, appellant held onto Villa's backpack strap, hit Villa's head several times

---

[1]     Villa testified that during the incident, he came to believe that appellant's gun was a BB gun because it rattled and seemed relatively light in weight.

2

with his gun, and ran away. According to Villa, appellant was wearing a black sweater during the incident.

Later, at approximately 12:14 p.m., Maria Villalpando was walking near the intersection of Kelso and Oak Streets in Inglewood. Appellant approached her, pointed a black gun at her head, and said, "Give me. Give me." Appellant then pulled a necklace off Villalpando's neck and fled. Villalpando noticed that appellant was wearing a gray t-shirt.

In response to a call regarding a person with a gun, Inglewood Police Officer Steve Romero was driving along Oak Street when he saw an African-American male running from Villalpando. Romero stopped his patrol car and requested backup to establish a containment area.

Los Angeles County Sheriff's Department Deputy Sheriff Adam Stoll, a police dog handler, searched the containment area with his dog. While Stoll conducted the search, a public address system made pre-recorded announcements notifying residents of the presence of a police dog. Stoll's dog discovered appellant behind some trash cans, approximately 80 to 100 feet from the location of Villalpando's robbery. Appellant was shirtless and appeared to have been crouching behind the trash cans. Stoll ordered his dog to release appellant, whom Stoll detained. Nearby, investigating officers found a black t-shirt, a black gun, and a necklace.

After 2:00 p.m., following appellant's detention, investigating officers drove Villalpando to view appellant. According to Villalpando, upon arriving at appellant's location, she remained in the patrol car, which was parked approximately 40 feet from appellant. Appellant was handcuffed and standing with his back toward her. When appellant turned around, she recognized and identified him as the person who took her necklace. The officers then showed Villalpando a necklace, which she identified as her own.

3

The officers also drove Villa to appellant's location for a field showup. Before Villa looked at appellant, an officer told Villa not to make an identification unless the person displayed was Villa's assailant. Villa remained seated in the patrol car while he was shown appellant, who was shirtless, handcuffed, and approximately 40 feet from the vehicle. Villa identified appellant as the person who hit him with a gun and tried to rob him.

B. *Defense Evidence*

Appellant, who testified on his own behalf, denied that he engaged in any misconduct regarding Villa and Villalpando. According to appellant, at the time of the underlying incidents, he was in the tenth grade, and took special education classes. On July 2, 2012, he attended a summer school class until noon. After leaving school, he walked toward a friend's house. When a boy carrying a gun demanded the contents of appellant's pockets, he fled and hid behind some trash cans. Later, after a police dog found appellant, police officers detained him. According to appellant, while he hid, he heard no public announcements regarding a police dog, and did not notice the gun and necklace near him.

Mychelle Hernandez, a defense investigator, testified that she interviewed Villalpando, who described her assailant as an African-American male between the ages of 18 and 20. According to Hernandez, Villalpando stated that before she viewed appellant during the field show up, the investigating officers said that the person she would see had possessed her necklace chain. Hernandez also stated that Villalpando had claimed there was an age difference between her assailant and appellant, and that she had identified appellant as her assailant because he had been detained.

Inglewood Police Officer Jesse Guizar testified that he and his partner wrote a report regarding their role in the investigation of Villa's robbery. According to

4

the report, a witness to the robbery told Guizar's partner that Villa's assailant ran north from the scene of the crime and drove away in a gray car.

Mitchell Eisen, a psychologist, testified regarding factors that affect the memories of eyewitnesses. According to Eisen, a witness's ability to identify an individual is diminished by suggestive statements, delays in making the identification, stress, and other circumstances. In addition, witnesses often find it difficult to identify a person of a different race. Eisen further opined that photographic "6-pack[s]" result in more reliable identifications than field showups involving a single suspect, especially when the witness receives no admonition that the presentation of a single individual does not signal that person's guilt.

## DISCUSSION

Appellant contends the evidence was insufficient to prove he was the person who assaulted and battered Villa while attempting to rob him, and who later robbed Villalpando. We disagree.[2] "[A]bsent physical impossibility or inherent improbability, the testimony of a single eyewitness is sufficient to support a criminal conviction. [Citation.]" (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.) Here, Villa and Villalpando positively identified appellant as their assailant

---

[2]    "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

5

shortly after the incidents and during the evidentiary hearing. Their testimony was further corroborated by the circumstances surrounding appellant's arrest, including the presence of Villalpando's necklace and a gun near appellant's hiding place. On this evidence, the juvenile court could properly conclude that it was appellant who committed the offenses against Villa and Villalpando.

Pointing to Eisen's expert testimony, appellant maintains that reliance upon the field showup identifications to establish his guilt constitutes a denial of due process. The crux of his contention is that the field showups involved unreliable or unduly suggestive procedures. Appellant argues that Villalpando and Villa had only a limited opportunity to view their assailant, due to the brevity of the incidents and distractions that occurred during them; that the showups occurred two or more hours after the crimes; that neither Villalpando nor Villa received adequate admonitions before the showups; and that the showups involved cross-racial identifications.

Appellant has forfeited his contention regarding the field showup identifications, as he never sought to exclude that evidence before the trial court. Generally, to preserve an issue on appeal regarding the admission of evidence, a party must comply with Evidence Code section 353, which requires "an objection . . . so stated as to make clear the specific ground of the objection . . . ." (Evid. Code § 353, subd. (a).) This requirement encompasses objections based on due process. (*People v. Williams* (2008) 43 Cal.4th 584, 625.)

Pointing to Chief Justice Bird's concurring and dissenting opinion in *People v. Frank* (1985) 38 Cal.3d 711 (*Frank*), appellant suggests that his failure to object did not work a forfeiture. We disagree. In *Frank*, a capital case, the defendant challenged the admission of certain evidence as the product of an unlawful search and seizure. (*Id.* at p. 722.) Although his contention on appeal relied on a ground not clearly presented to the trial court, a plurality of the Supreme Court justices

6

concluded that it was appropriate to address the contention on the merits, stating: "[W]hile in a noncapital case a claim of erroneous admission of evidence will not be reviewed in the absence of a timely and proper objection [citation], we have long followed a different rule in capital cases. On an appeal from a judgment imposing the penalty of death, a technical insufficiency in the form of an objection will be disregarded and the entire record will be examine [*sic*] to determine if a miscarriage of justice resulted." (*Id*. at p. 729, fn. 3.) In a separate concurring and dissenting opinion, Chief Justice Bird agreed with that portion of the plurality opinion, noting that the Assembly Judiciary Committee Comment to Evidence Code section 353 contemplated an exception to the objection requirement when the erroneous admission of evidence results in a denial of due process. (*Frank, supra,* 38 Cal.3d at p. 737.)

As the *Frank* exception to the forfeiture rule is operative only in capital cases, it is inapplicable here. Moreover, we observe that even in capital cases, our Supreme Court has repeatedly declined to invoke the exception when the defendant asserted *no* objection to the pertinent evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 208-209; *People v. Zapien* (1993) 4 Cal.4th 929, 979-980.) Accordingly, under the circumstances present here, appellant has forfeited his contention.

Moreover, even had appellant preserved his contention for appeal, we would conclude that the identification evidence was properly admitted. Generally, "'[t]he "single person showup" is not inherently unfair.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 413, quoting *People v. Floyd* (1970) 1 Cal.3d 694, 714.)[3] "[T]he law

---

[3]  Our Supreme Court has explained: "'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the
*(Fn. continued on next page.)*

favors field identification measures when in close proximity in time and place to the scene of the crime," as the potential unfairness in such measures is ordinarily "'offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later.'" (*In re Richard W.* (1979) 91 Cal.App.3d 960, 965-967, 970, quoting *People v. Anthony* (1970) 7 Cal.App.3d 751, 764-765.) Numerous courts have approved field showup procedures similar to those employed here. (E.g., *People v. Anthony*, *supra*, 7 Cal.App.3d at p. 764 [witness was shown defendant, who was handcuffed and seated in police car]; *People v. Colgain* (1969) 276 Cal.App.2d 118, 122 [victim was shown defendant, who was handcuffed and standing next to police car]; *People v. Burns* (1969) 270 Cal.App.2d 238, 243-244 (*Burns*) [victim was shown defendant, who stood near his own car, surrounded by police vehicles].)

Furthermore, the circumstances surrounding the field showups, viewed in the light most favorable to the judgment, establish no denial of due process. (See *People v. Thomas* (2012) 54 Cal.4th 908, 930-931 [trial court's factual findings regarding identification procedures are subject to deferential review on appeal].) Although the crimes were completed in a minute or less, Villalpando and Villa each testified that they looked directly at their assailant's face. (*People v. Flint* (1986) 180 Cal.App.3d 13, 18-19 [approving field showup, even though witness had only brief and partial view of burglar].) The two-to-three hour delay between the crimes and the showups did not render the identification procedure unreliable.

_____

opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.]" (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 412.)

(*People v. Rodriguez* (1987) 196 Cal.App.3d 1041 [approving field showups that occurred approximately nine hours after crimes].) Nor was either the absence of full pre-identification admonitions or the presence of cross-racial identifications a fatal defect. (See *Burns, supra*, 270 Cal.App.2d at pp. 245-246 [approving field showup, even though prior to the showup, witness overheard defendant described as "suspect" by officers, who otherwise did not discuss the pending possible identification with witness]; *People v. Mohamed* (2011) 201 Cal.App.4th 515, 520-523 [field showup identifications constituted substantial evidence to support criminal conviction, even though they involved cross-racial identifications].)[4]

Appellant directs our attention to evidence that officers made suggestive remarks to Villalpando before the field showup, and that Villalpando may have lacked the ability to make a cross-racial identification. Regarding these matters, the defense investigator testified that Villalpando told her that during the field showup, an officer presented appellant to her as "the person who took the chain." Furthermore, when defense counsel asked Villalpando whether she expressed any doubts regarding her field identification to the defense investigator, Villalpando

---

[4]     Pointing to *Meza v. City of Los Angeles* (C.D. Cal., May 26, 2009) 2009 U.S. Dist. LEXIS 43979 (*Meza*), appellant suggests that a field showup results in a denial of due process unless the witness is admonished he is a "'possible suspect only,'" that his presence in custody "'does not indicate guilt or innocence,'" and that "'the purpose of the [showup] is either to eliminate or identify the person as the perpetrator.'" That proposition, however, finds no support from *Meza*. There, the plaintiff asserted federal civil rights claims arising out of his arrest for second-degree robbery, which followed two field showups. (*Meza, supra*, at *2-*7.) In granting summary judgment on those claims, the trial court concluded that the field showups were not unduly suggestive, even though the witness received no admonition prior to the first showup. (*Id*. at *16-*17.) The court stated: "Although a proper pre-identification admonition does weigh in favor of reliability, [p]laintiff provides no caselaw suggesting that a failure to give this admonition is per se evidence of unreliability." (*Id*. at *18.)

9

replied, "No. [The investigator] asked me if I was sure about what I was saying. And I said, Yes, because all of them look the same. And, well[,] all the latinos look the same."

Although these aspects of the trial evidence may suggest inferences that challenge Villalpando's identification testimony, they do not render that testimony insufficient to support appellant's conviction. As our Supreme Court has explained, "[t]o warrant the rejection of the statements given by a witness who has been believed by [the fact finder], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Huston* (1943) 21 Cal.2d 690, 693, disapproved on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352.)

Here, the evidence upon which appellant relies does not meet the demanding standards for rejecting a witness's testimony. Regarding the possibility that an officer made suggestive remarks to Villalpando prior to the field showup, Villalpando testified that she first saw her necklace *only after* she identified appellant during the showup, and that the officer who displayed it to her said that it had been found in a yard. Furthermore, regarding Villalpando's remarks that "all of them" and "all the latinos" look the same, we note that what Villalpando intended to say is unclear, as she made the remarks while explaining why she had *no* doubts regarding her identification. Neither defense counsel nor the prosecutor asked Villalpando to clarify the remarks, even though she testified through a translator because she speaks only Spanish. For this reason, the record does not clearly establish the relevance of the remarks to Villalpando's ability to make a

10

cross-racial identification of an African-American assailant.  We decline to substitute our judgment for that of the juvenile court regarding that ability.  In sum, there was sufficient evidence to support the juvenile court's determinations.

## DISPOSITION

The orders of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

11